# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CLAUDIA PATRICIA ) 
CRUZ-ROLDAN, )
)
   **Plaintiff,** )
)
   **v.** ) **Case No. 16-cv-1308 (RJL)**
)
GREG NAGURKA, )
)
   **Defendant.** )
)

## MEMORANDUM OPINION
(February ⟨4⟩, 2020) [Dkt. #34]

Plaintiff, Claudia Patricia Cruz-Roldan ("plaintiff" or "Cruz-Roldan"), a childcare provider at a local day care facility, was the subject of a criminal investigation into child abuse. The U.S. Attorney's Office for the District of Columbia ("the Government") charged her in District of Columbia Superior Court with second degree cruelty to children and simple assault, but ended up voluntarily dismissing the charges. Cruz-Roldan maintains her innocence and claims the investigation and criminal charges went too far. She brought this action against Greg Nagurka ("defendant" or "Nagurka"), who was the lead detective on the case for the D.C. Metropolitan Police Department. She alleged several tort claims, brought under D.C. law, as well as several constitutional violations, brought under § 1983. Am. Compl. [Dkt. #5]. After I considered and dismissed some of her claims, *see* [Dkt. #20], the parties moved to discovery on those that remained: common law negligence (Count I), common law battery (Count II), common law intentional

1

infliction of emotional distress (Count III), common law false arrest (Count IV), and Fourth Amendment false arrest (Count VI).[1]

Nagurka now moves for summary judgment on all Cruz-Roldan's remaining claims. *See* Def.'s Mot. for Summ. J. ("Def's Mot.") [Dkt. #34]. On the false arrest claims, he argues that he had probable cause to arrest Cruz-Roldan for second degree child abuse and is entitled to qualified immunity. With regard to battery, Nagurka contends that a lawful arrest made without excessive force cannot give rise to battery. As for the negligence claim, he insists that plaintiff failed to establish a standard of care that he breached and that, in any event, he is protected by the public duty doctrine. Finally, Nagurka argues that plaintiff lacks sufficient facts to support intentional infliction of emotional distress. For the reasons described herein, Nagurka's motion for summary judgment is **GRANTED**, in part. The motion is **DENIED**, in part, as to negligence. As this ruling disposes of all the federal questions in this case, and as this case was removed from D.C. Superior Court based on federal question jurisdiction, I **REMAND** the case back to the D.C. Superior Court for further proceedings.

## BACKGROUND

Before explaining my reasons for granting summary judgment, a little background is necessary. Note, however, that I have included here only those facts—undisputed or

---

[1] Plaintiff originally brought a claim for common law slander, which survived defendant's motion to dismiss. Plaintiff declined to proceed with this claim at summary judgment, so I dismiss it. *See* [Dkt. #35] at 50.

indisputable—that are material to deciding this motion.[2]

## J.S.'s Injuries and Start of the Investigation

On May 18, 2015, J.S., a three-month-old boy, was brought to Kiddie Academy, a child care facility in the District of Columbia, where he was cared for by Cruz-Roldan, Mayra Lopez ("Lopez"), and Mary Washington. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") 3 ¶ 1; Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") 1 ¶ 1. When J.S.'s mother picked J.S. up later that day, she noticed marks on his body that had not been there when she dropped him off. Pl.'s Opp'n 3 ¶ 3; Def.'s Reply 2 ¶ 3. J.S.'s mother called Kiddie Academy that night to complain, and Kiddie Academy's owner, Milena Mattingly ("Mattingly"), reviewed footage of J.S.'s classroom from earlier that day. Dep. of Milena Mattingly, Pl.'s Opp'n Ex. 1 ("Mattingly Dep.") [Dkt. #35-1] 14:1, 15:17; Pl.'s Opp'n 4 ¶ 5; Def.'s Reply 2 ¶ 5.

The following day, J.S.'s mother brought J.S. to Children's National Medical Center ("Children's"). Def.'s Mot. for Summ. J. Statement of Material Facts ("Def.'s Mot. SOMF") 3 ¶ 2; June 5, 2015 Report of Investigation ("June 5 Report"), Def.'s Mot. Ex. 1 [Dkt. #34-1] at 3.[3] Dr. Allison Jackson ("Dr. Jackson"), a physician at Children's,

---

[2] Where facts are disputed, I side with the plaintiff and draw all justifiable inferences in her favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), except where her version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[3] Plaintiff contested portions of five of the twenty-six paragraphs of undisputed material facts proposed by defendant. *See* Pl.'s Opp'n 17–19. Where, as here, I cite solely to defendant's motion and the record for a particular fact, I consider that fact undisputed for purposes of this motion. *See* F. R. Civ. P. 56(e)(2) ("If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . .").

examined J.S. Pl.'s Opp'n 4 ¶ 7; Def.'s Reply 2 ¶ 7. Dr. Jackson took photographs of what she considered to be abnormalities on his body. *Id.* Ultimately, a mandated reporter contacted the Child and Family Services Agency and reported suspected abuse. Def.'s Mot. SOMF 3 ¶ 1; June 5 Report at 3.

Nagurka was assigned to investigate the suspected abuse. Pl.'s Opp'n 3–4 ¶ 4; Def.'s Reply 2 ¶ 4. On May 20, 2015, he interviewed the mandated reporter, who told him about the hospital visit. Def.'s Mot. SOMF 3 ¶ 2; June 5 Report at 3. The next day, Nagurka interviewed J.S.'s mother, who provided a timeline of her discovery of J.S's bruises: First, J.S. had been under his parents' supervision during the weekend of May 16–17, 2015. Def.'s Mot. SOMF 4 ¶ 5; June 5 Report at 4. Second, on the morning of May 18, 2015, J.S.'s mother changed his clothes at approximate 8:00 a.m. and saw no bruising. *Id.* Third, J.S.'s mother dropped him off at Kiddie Academy at approximately 9:00 a.m. and picked him up at approximately 4:45 p.m. *Id.* Fourth, J.S.'s mother undressed him at approximately 6:00 p.m. that evening and discovered the bruises. *Id.*

On May 22, 2015, Dr. Jackson completed a Medico-Legal Form for Abused Children and provided it to Nagurka. Def.'s Mot. SOMF 4 ¶ 6; June 5 Report at 4; Def.'s Mot. Ex. 2 [Dkt. #34-2] at 2. On the form, she wrote the following:

> [J.S.] has at least 12 discrete bruises to his back, left arm and both thighs which are primarily linear or curvilinear in shape. Such bruises would require blunt or compressive force from an object(s) with a linear/curvilinear component. Bruising in any infant this young is concerning for inflicted trauma. Developmentally, there is no reasonable activity that would result in such bruises. He has no medical history or prior signs/symptoms suggestive of an underlying bleeding disorder. The findings are most consistent with inflicted trauma.

Def.'s Mot. Ex. 2.

## Video Evidence

Nagurka traveled to Kiddie Academy on May 21, 2015 and spoke with Mattingly, who provided him with video footage of J.S.'s classroom from May 18, 2015.[4] Def.'s Mot. SOMF 3 ¶ 3; June 5 Report at 3. On May 27–28, 2015, Nagurka reviewed all eight hours of Kiddie Academy video footage depicting the area where J.S. was located on May 18, 2015. Pl.'s Opp'n 4 ¶ 8; Def.'s Reply 3 ¶ 8; Def.'s Mot. SOMF 2 ¶ 8; June 5 Report at 4. He watched the complete footage at normal speed and with full audio. Def.'s Mot. SOMF 2 ¶ 9.

At two points, the video depicts Cruz-Roldan patting J.S.'s back with sufficient force that it is audible on camera. Pl.'s Opp'n 4 ¶¶ 8–9; Def.'s Reply 3 ¶¶ 8–9; Surveillance Video of May 18, 2015 ("May 18 Video"), Def.'s Mot. Ex. 4, 01:31:43– 32:00, 02:07:30–43.[5] During both sets of patting, a baby can be heard crying loudly. May 18 Video 01:31:43–32:00, 02:07:30–43. Cruz-Roldan stated at her deposition that the first clip depicted J.S. crying. *See* Cruz-Roldan Dep., Pl.'s Opp'n Ex. 5 [Dkt. #35-5] 44:1–3. In an investigative report dated a week later, Nagurka described the patting as "loud and excessive." Def.'s Mot. SOMF 5 ¶ 10; June 5 Report at 3. In her later

---

[4] Cruz-Roldan notes that Mattingly reviewed the video and saw nothing to suggest that Cruz-Roldan had done anything wrong. *See* Pl.'s Opp'n 4 ¶ 5. Mattingly testified at her deposition that she reviewed the day's footage, skipping around to try to determine what might have happened to J.S., but saw nothing concerning. *See* Mattingly Dep. 14:3– 19:12.

[5] Plaintiff focuses on solely the first example in her statement of material facts, but the second example is clear in the cited portion of the video.

deposition, Cruz-Roldan explained that the video depicted her burping J.S. Pl.'s Opp'n 4 ¶ 9; Def.'s Reply 3 ¶ 9.

Nagurka sent a clip to Dr. Jackson for review of the video depicting the first time Cruz-Roldan patted J.S. Pl.'s Opp'n 5 ¶ 11; Def.'s Reply 3–4 ¶ 11.[6] On June 1, 2015, Dr. Jackson emailed Nagurka after reviewing the video clip. Pl.'s Opp'n 5 ¶ 12; Def.'s Reply 4 ¶ 12. In her email, she stated that "while [Cruz-Roldan] is patting [J.S.] quite vigorously," Dr. Jackson "d[id not] think th[e] clip show[ed] enough to explain his injuries." Id. In addition to the contact he observed on the video, Nagurka observed a blind spot near the classroom's changing station. Def.'s Mot. SOMF 5 ¶ 11.

**Lopez Interviews**

Cruz-Roldan's co-worker Lopez, who was working in the United States on a "green" card, sat for several interviews. Pl.'s Opp'n 3 ¶ 2; Def.'s Reply 2 ¶ 2. First, on May 21, 2015, Nakurka interviewed Lopez. Pl.'s Opp'n 4 ¶ 6; Def.'s Reply 2 ¶ 6. She denied harming J.S. or witnessing anyone else harming him. Id. Second, on June 1, 2015, social worker Jacqueline Simpkins interviewed Lopez with Nagurka present. Pl.'s Opp'n 5 ¶ 13; Def.'s Reply 4 ¶ 13. During this interview, Lopez stated that she had not seen any pinching or other type of improper conduct by Cruz-Roldan. Pl.'s Opp'n 5 ¶ 14; Def.'s Reply 4 ¶ 14. Third, on June 3, 2015, Nagurka interviewed Lopez once more about whether she had seen Cruz-Roldan abusing J.S. or other children. Pl.'s Opp'n 5

---

[6] Plaintiff submitted this clip as Exhibit 6 to her Opposition to Summary Judgment. It begins one hour, twenty-nine minutes, eight seconds into the video submitted by Nagurka and runs for three minutes, forty-eight seconds. See May 18 Video 01:29:08–32:56.

¶¶ 16–17; Def.'s Reply 4 ¶¶ 16–17. Another detective, Jenny Alvarenga, was also present. Pl.'s Excerpts of Tr. of Dep. of Greg B. Nagurka ("Pl.'s Nagurka Dep."), Pl.'s Opp'n Ex. 3 [Dkt. #35-3] at 52:18–53:7.

This third interview—and whether statements Lopez made implicating Cruz-Roldan were coerced—is the subject of the most serious dispute between the parties. Fortunately, the interview was videotaped. *See* Def.'s Mot. Ex. 5 ("Lopez Interview"). Before the interview began, Nagurka confirmed that the door to the interview room was unlocked, Lopez Interview 00:01:15–19, 00:03:56–57, that Lopez was not under arrest, and that she was free to leave at any time, *id.* 00:03:58–04:12. Gesturing to the (unlocked) shackles on the ground connected to the chair in which Lopez was sitting, Nagurka, "apologize[d] for the chair." *Id.* 00:01:30–33. He then pointed out the camera and explained that everything was being recorded. *Id.* 00:01:26–33. Narguka also explained that Alvarenga was there to translate if Lopez wanted help understanding something or if she preferred to speak in Spanish. *Id.* 00:02:18–50. Lopez confirmed that she had come to the station for her interview voluntarily. *Id.* 00:02:00–09.

Several portions of this interview are worth highlighting. Early in the interview, Lopez re-stated that she had not seen Cruz-Roldan handle any children in a way that was inappropriate or would cause them injury. Pl.'s Opp'n 5 ¶ 17; Def.'s Reply 4 ¶ 17; Lopez Interview 00:13:55–14:11. Then, Nagurka showed Lopez the first clip depicting Cruz-Roldan patting J.S. Def.'s Mot. SOMF 3 ¶ 13-2; Pl.'s Opp'n 17 ¶ 2; Lopez Interview 00:14:30–17:18. In response to questioning by Alvarenga and Nagurka, Lopez said Cruz-Roldan was "hitting [J.S.] hard" and that Lopez would "never do that to a baby, not

that hard." Def.'s Mot. SOMF 3 ¶¶ 13-3, 13-4; Lopez Interview 00:17:32–38, 00:17:59–18:13. Nagurka asked Lopez once again if she had ever seen Cruz-Roldan doing that before, and Lopez once again said no. Def.'s Mot. SOMF 3 ¶ 13-5; Lopez Interview 00:18:30–35.

At this point, the interview took on a somewhat more confrontational tone. Nagurka explained that "the issue" was that Lopez was in the room with Cruz-Roldan and had glanced over while Cruz-Roldan was patting J.S. *Id.* 00:19:30–19:50. Alvarenga asked if it was normal for Cruz-Roldan to burp a baby that way, and Lopez replied that Cruz-Roldan had done so once before but had explained that it was necessary to get the air out. *Id.* 00:21:20–21:40. After prompting by Alvarenga, Lopez agreed that she thought it odd when Cruz-Roldan had burped the baby that way previously, but Lopez added that she had not said anything to Cruz-Roldan. *Id.* 00:21:40–22:00. Lopez explained that this previous time had involved a baby called "N.," and that Cruz-Roldan had patted him in a "hard" way. *Id.* at 00:22:10–22:37.

Nagurka then showed Lopez J.S.'s medical file, pointing to photographs of his bruises. *Id.* at 00:25:10–26:15. Nagurka explained that a doctor had concluded that the injuries had been caused by force or compression, like pinching, and asked if Lopez had seen anything like that. *Id.* at 00:26:20–26:52. After Lopez shook her head, Nagurka told her she had to be honest with them because he did not want her to get caught up in something she should not be caught up in, given that this was her job and what she wanted to do going forward. *Id.* 00:26:52–27:25. Nagurka added:

> If you know more than what you're telling us now, you're going to involve yourself in what you just saw in that video. . . . You're not under arrest, but if you saw something . . . you have to be able to explain it to us. . . . This is your last opportunity.

*Id.* 00:27:25–28:28. Lopez then said, "I just didn't want to get her in trouble." *Id.* 00:28:33–37. Nagurka replied:

> At this point she's already in trouble, so there's nothing you're going to do. The only thing you're going to do is get yourself in trouble by not telling us something that you know. . . . You want to be with her? You can join her. But if you don't want to be with her, you got to tell us the truth. . . . You want to save your butt? Alright? You want to have a job? You want to go home at night and be with your family? All that stuff, you have to be honest with us right now.

*Id.* 00:28:38–29:12; *see also* Pl.'s Opp'n 6 ¶ 18; Def.'s Reply 5 ¶ 18. Lopez then began to cry, while Alvarenga asked her "What didn't you want to tell us?." Lopez Interview 00:29:13–16. Lopez responded:

> Something I already saw happen. When she had the babies, they always cry with her. When I . . . change them, I saw marks on them all the time. Cause it was unusual that they would cry to hard. So I saw her sometimes pinching them too. But I never said anything because I didn't want to get her in trouble, because she helped me get this job.

*Id.* 00:29:26–55.

She added, "Baby N[.], he suffers so much with her. . . . She would pinch him all the time." *Id.* 00:30:57–31:25. Nagurka followed up by asking, yet again, if Lopez had seen Cruz-Roldan pinch J.S., but Lopez maintained that she did not see Cruz-Roldan doing so. *Id.* 00:31:30–31:37. However, Lopez believed Cruz-Roldan was responsible, as she had seen other children with bruises after they had been handled by Cruz-Roldan. *Id.* 00:31:45–32:15.

9

Nagurka asked for one example of when Cruz-Roldan had hurt N., describing when and how Cruz-Roldan had held him. Lopez indicated that as Cruz-Roldan was putting the baby down, she would pinch him on his thigh. *Id.* 00:32:20–33:08. Nagurka then explained that this was serious and that Lopez was describing a crime. *Id.* 00:33:13–29. Nagurka added that he thought Lopez was telling the truth, and as a result, she would probably be able to leave today, after he had the chance to speak with Cruz-Roldan. *Id.* 00:33:29–34:05. Nagurka then left the room to begin interviewing Cruz-Roldan while Alvarenga asked Lopez more questions. *See id.* 00:34:30–35:05; Pl.'s Nagurka Dep. 90:12–22.

### Cruz-Roldan Interview and Arrest

Cruz-Roldan was also interviewed. First, on May 21, 2015, Nagurka interviewed her at Kiddie Academy. *See* Pl.s Nagurka Dep. 19:15–21, 21:4–22:12. Then, on June 3, 2015, Nagurka and Alvarenga interviewed and, ultimately, arrested Cruz-Roldan. Pl.'s Opp'n 7 ¶ 27. This interview, too, was videotaped. *See* Def.'s Mot. Ex. 6 ("Cruz-Roldan Interview"). Throughout most of this interview, Cruz-Roldan denied having anything to do with J.S.'s injuries. Pl.'s Opp'n 7 ¶ 27. But after a brief discussion in Spanish with Alvarenga about the word "pinch," the following exchange took place:

| | |
|---|---|
| ALVARENGA: | Yes, she's saying yes, it is possible that at some point she did that. |
| NAGURKA: | Okay well, I, I'm not . . . the police department we don't deal with possible – it is either yes or no. |
| CRUZ-ROLDAN: | [Speaking Spanish and pantomiming holding a child.] |
| ALVARENGA: | She's saying yes, when she was holding him yes. |
| . . . | |
| CRUZ-ROLDAN: | I'm telling you, when I was hugging him, yeah, maybe yeah. |

| | |
|---|---|
| NAGURKA: | Well, listen, Ms. Patricia, I'm telling you right now, it's either yes or no. |
| CRUZ-ROLDAN: | No, yes. Yes, of course. |
| NAGURKA: | Did you cause these injuries to [J.S.]. It's yes or no. Because the video cannot lie. You have to explain the video. |
| . . . | |
| NAGURKA: | Did you cause these bruises that you saw? The photos and the marks on the back, on the legs, did you do that? Yes or no? |
| CRUZ-ROLDAN: | Yeah. |
| NAGURKA: | Yes? Yes you did do it? |
| CRUZ-ROLDAN: | Yes, yeah, maybe. |
| NAGURKA: | Can you explain to me why you did it. |
| CRUZ-ROLDAN: | I did it without intention, Greg, without intention as – |
| NAGURKA: | But you're telling me right now that yes, you did do it. |
| CRUZ-ROLDAN: | Well, because you say or yes or no. |
| NAGURKA: | I'm talking about the photos. |
| CRUZ-ROLDAN: | Um hmm. |
| NAGURKA: | You saw the injuries of [J.S.], okay? |
| CRUZ-ROLDAN: | Um hm. Um hmm. |
| NAGURKA: | That was [J.S.], those were the bruises. The bruises on – he had twelve bruises on his back, he had these bruises on his skin right here [pointing to paper], and these are where the doctor – this is the doctor's handwriting. |
| CRUZ-ROLDAN: | [Pointing to paper.] But – but – okay, so – there are these ones when I made there – when I was, yeah, definitely has it. You know, this one when I was pat him a little a bit. But this one? On his arm? |
| NAGURKA: | That was the "Y." You saw it was like a "Y"? |
| CRUZ-ROLDAN: | Yeah, the "Y," yeah. |
| NAGURKA: | I mean, but how can you explain that? |
| CRUZ-ROLDAN: | No. I can – I can be responsible to be honest, for that part and the back, [gesturing to another part of the drawing] can't tell you that. Yeah, no. To be honest, when I saw you, when I hear you – |
| NAGURKA: | I appreciate your honesty. |
| CRUZ-ROLDAN: | No. I telling you. |

Pl.'s Opp'n 7–8 ¶ 27; Def.'s Mot. SOMF 6–7 ¶ 15; Cruz-Roldan Interview 01:57:00–

02:00:30. Thereafter, Cruz-Roldan asked to use the restroom. Def.'s Mot. SOMF 8 ¶ 16;

Cruz-Roldan Interview 02:00:18–27. When she returned, Nagurka arrested her. Def.'s Mot. SOMF 8 ¶¶ 17–18; Cruz-Roldan Interview 02:05:00–12:12. The following day, she was charged in D.C. Superior Court with one count of attempted second degree cruelty to children with respect to J.S. Pl.'s Opp'n 8 ¶ 28; Def.'s Reply 8 ¶ 28.

In support of this charge, Nagurka swore out a Gerstein affidavit providing some details of the investigation to that point. *See* June 4, 2015 Affidavit of Nagurka ("June 4 Gerstein Affidavit"), Pl.'s Opp'n Ex. 9 [Dkt. #35-9]. Among these details were Dr. Jackson's conclusions that J.S.'s bruises were caused by blunt or compressive force, a statement that the video showed Cruz-Roldan "slapping [J.S.] on his back," and a statement that Cruz-Roldan "confessed to causing all the lower body bruising to" J.S. *Id.*

### Investigation of Alleged Injuries to Other Children

During her June 3, 2015 interview, Lopez alleged that Cruz-Roldan had harmed children other than J.S. While Nagurka was present, Lopez stated explained that "baby N[], he suffers so much with her. . . . She would pinch him all the time." *Id.* 00:30:57–31:25. After Nagurka left the room, Lopez also identified injuries to "C." and "G." *See* Pl.'s Opp'n 9 ¶ 29; Def.'s Reply 8 ¶ 29; Lopez Interview 00:36:03–25, 00:40:40–50.[7] Lopez also said that she had spoken with another teacher, "Ms. Jenny," and told her what was going on. Lopez Interview 00:57:42–59:35.

---

[7] At this point, Lopez also made somewhat contradictory statements about hearing Cruz-Roldan patting J.S. At first, she said that she did hear it, but thereafter she said that the other babies were crying, so she did not hear it loudly but knew it was happening. Lopez Interview 00:37:35–38:09.

Nagurka followed up on these allegations but was unable to substantiate them. Nagurka interviewed the parents of C. and G., but they had no concerns about Cruz-Roldan's care of their children. Pl.'s Opp'n 9 ¶ 30; Def.'s Reply 8 ¶ 30. As for N, Nagurka spoke with Ms. Jenny, but she denied that Lopez had ever mentioned the abuse. Pl.'s Opp'n 9 ¶ 32; Def.'s Reply 9 ¶ 32. In addition, when Nagurka later reviewed other Kiddie Academy video footage (focusing on a different child, A.R.), he kept an eye out for N. and C. but did not see any indication of abuse. Pl.'s Opp'n 9 ¶¶ 33–34; Def.'s Reply 9 ¶¶ 33–34; Pl.'s Nagurka Dep. 137:20–138:10, 148:14–149:10.

Nagurka also became aware of an allegation that Cruz-Roldan had pinched A.R. on the cheek.[8] On June 15, 2015, Nagurka spoke with A.R.'s parents, who indicated that they had noticed a bruise on A.R.'s leg around April 1, 2015 and a bruise on A.R.'s *right* cheek around April 24, 2015. Pl.'s Opp'n 10 ¶¶ 36–37; Def.'s Reply 9–10 ¶¶ 36–37; Def.'s Mot. SOMF 6 ¶ 20; Pl.'s Nagruka Dep. 122:10–123:12. A.R.'s parents told Nagurka that they had asked Cruz-Roldan about the bruise on her cheek, and Cruz-Roldan told them that A.R. had poked herself with a toy. Pl.'s Opp'n 10 ¶ 36; Def.'s Reply 9–10 ¶ 36. On June 26, 2015, Nagurka obtained daily health checkup sheets for A.R. from Mattingly. Def.'s Mot. SOMF 6 ¶ 21; June 29, 2015 Report of Investigation

---

[8] At his deposition, relying on an undated set of notes, *see* Pl.'s Opp'n Ex. 12 [Dkt. #35-12], Nagurka testified that he became aware of this allegation by reviewing the tape of Alvarenga's interview with Lopez after he left the room on June 3, 2015. *See* Pl.'s Nagurka Dep. 85:13–86:16, 88:12–20, 89:19–90:11. After reviewing the same video, I did not hear Lopez identify injuries to A.R. However, she did state during the interview that Cruz-Roldan "does it to everybody," Lopez Interview 00:34:45–57, and after she identified Noah and Caroline, she trailed off and explained "I can't remember the name of the other babies," *id.* 00:36:10–33.

("June 29 Report"), Def.'s Mot. Ex. 7 [Dkt. 34-7] at 2. These sheets indicated that from April 6–8 2015, A.R. had bruises on both cheeks and that from April 27–29, A.R. had a bruise on one of her cheeks. *Id.*; Pl.'s Nagurka Dep. 162:14–19. Thereafter, on June 28, 2015, Nagurka spoke again with Lopez, who indicated that she had observed Cruz-Roldan pinch A.R. on a couple of occasions. Def.'s Mot. SOMF 7 ¶ 22; Pl.'s Nagurka Dep. 106:2–109:20. On one of these occasions, Lopez reported that Cruz-Roldan had grabbed A.R.'s cheek, that the cheek had bruised during the day, and that when A.R.'s mother had asked what happened, Cruz-Roldan said that A.R. had hit herself with a toy. *Id.*

On July 15, 2015, Nagurka checked Kiddie Academy videotape from around this period and located a clip from April 23, 2015, which showed Cruz-Roldan touching A.R.'s *left* cheek. Pl.'s Opp'n 10 ¶ 38; Def.'s Reply 10 ¶ 38. Nagurka was unable to find any evidence from his review of the videotapes that Cruz-Roldan had pinched A.R.'s right cheek. Pl.'s Opp'n 10 ¶ 40; Def.'s Reply 10 ¶ 40. Plaintiff has identified a clip showing another child touching A.R.'s right cheek from around this period, but Nagurka testified at his deposition that he had not noticed this incident. Pl.'s Opp'n 10–11 ¶ 41; Def.'s Reply 10 ¶ 41.

On July 17, 2015, Nagurka swore out an affidavit in support of an arrest warrant for Cruz-Roldan on another charge of second degree cruelty to children based on her actions against A.R. Pl.'s Opp'n 11 ¶ 42; Def.'s Reply 10 ¶ 42; *see* July 17, 2015 Affidavit of Nagurka ("July 17 Affidavit"), Pl.'s Opp'n Ex. 15 [Dkt. #35-15]. This affidavit recounted the above information, including a statement that Nagurka had

14

observed video of Cruz-Roldan pinching A.R.'s left cheek on April 23, 2015. Pl.'s Opp'n 11 ¶ 43; Def.'s Reply 11 ¶ 43; July 17 Affidavit. Nagurka's affidavit did not state that there was no injury to A.R.'s left cheek, nor did it state that he did not observe Cruz-Roldan touching A.R.'s right cheek. Pl.'s Opp'n 11 ¶ 45; Def.'s Reply 11 ¶ 45. Nagurka's affidavit also made no mention of Lopez's allegations regarding N., C., and G., and Nagurka's inability to corroborate them. Pl.'s Opp'n 11 ¶ 47; Def.'s Reply 11 ¶ 47. On July 15, 2015, a Superior Court judge issued an arrest warrant for Cruz-Roldan based on this affidavit, Def.'s Mot. SOMF 7 ¶ 24, and on July 22, 2015, Cruz-Roldan was charged with one count of attempted second degree cruelty to A.R. Pl.'s Opp'n 12 ¶ 48; Def.'s Reply 11 ¶ 48.

## Cases Dismissed

Sometime after Cruz-Roldan was charged, prosecutors asked Nagurka if there was any Brady material which needed to be turned over to the defense. Pl.'s Opp'n 14 ¶ 61; Def.'s Reply 14 ¶ 61. At his later deposition, Nagurka could not recall what he told the prosecutors in response. *Id.* He stated that the did recognize as Brady material Dr. Jackson's opinion that the video clip Nagurka sent her did not fully explain J.S.'s injuries. Pl.'s Opp'n 14 ¶ 60; Def.'s Reply 14 ¶ 61.

Ultimately, the cases against Cruz-Roldan were dismissed by the Government after she filed a motion to dismiss citing *Brady* violations. Pl.'s Opp'n 14 ¶¶ 57–58; Def.'s Reply 14 ¶¶ 57–58. Thereafter, the court granted her motions to seal the records of her criminal cases, finding by a preponderance of the evidence that Cruz-Roldan did

not commit either of the offenses for which she was arrested. Pl.'s Opp'n 14 ¶ 59; Def.'s Reply 14 ¶ 59. Cruz-Roldan then filed the present suit.

## LEGAL STANDARD

Summary judgment is appropriate "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Airlie Foundation v. IRS*, 283 F. Supp. 2d 58, 61 (D.D.C. 2003) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. PEPCO* 447 F.3d 843, 850 (D.C. Cir. 2006). The Court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). "[W]hen the moving party has

carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Instead, to defeat summary judgment, an opposition must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant is required to provide evidence that would permit a reasonable jury to find in its favor. *Laningham v. Navy*, 813 F.2d 1236, 1243 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

Crucially in this case, when opposing parties submit different versions of the same story, and one story is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## ANALYSIS

### A. False Arrest

Plaintiff asserts claims of false arrest under both the Fourth Amendment (by way of § 1983) and common law. Each claim deals with both Cruz-Roldan's arrest for second degree cruelty to children as to J.S. and her arrest for attempted second degree cruelty to children as to A.R. The elements of both a common law false arrest claim and a Fourth Amendment false arrest claim are nearly identical. *Rice v. District of Columbia*, 774 F. Supp. 2d 18, 21 (D.D.C. 2011). Constitutional and common law claims of false arrest are

generally analyzed as though they comprise a single cause of action. *See, e.g., Scott v. District of Columbia*, 101 F.3d 748, 753–54 (D.C. Cir. 1996); *District of Columbia v. Minor*, 740 A.2d 523, 529 (D.C. 1999) (noting that, if the court finds a viable common law claim of false arrest, then a viable constitutional claim naturally flows, and vice versa). Because I conclude that Nagurka was legally justified in arresting Cruz-Roldan on both charges, I grant summary judgment in his favor as to both claims of false arrest.

### 1. Second Degree Cruelty to Children as to J.S.

First, summary judgment is appropriate on both false arrest counts related to Nagurka's arrest of Cruz-Roldan for cruelty to J.S. Nagurka arrested Cruz-Roldan for second degree cruelty to J.S. without first obtaining an arrest warrant. "Where . . . a false arrest claim is based on a warrantless arrest, the defendant officer[] must establish probable cause to arrest." *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993); *see also Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987) ("It is well settled that an arrest without probable cause violates the [F]ourth [A]mendment."). Thus, the existence of probable cause is an affirmative defense that can be raised to defeat an accusation of false arrest. *See Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009). "An arrest is supported by probable cause if, 'at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect has committed or is committing a crime." *Wesby v. District of Columbia*, 765 F.3d 13, 19 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018) (alteration in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The test

for determining whether or not a police officer had sufficient information and a reasonable belief that the suspect had committed a crime "is dependent entirely on the facts as they actually occurred—i.e., on the objective facts—without regard to what a police officer may have actually, even reasonably, perceived the facts to be." *District of Columbia v. Murphy*, 635 A.2d 929, 932 (D.C. 1993).

Here, the objective, undisputed (or indisputable) facts established probable cause for Nagurka to arrest Cruz-Roldan for second degree cruelty to children. An individual is guilty of this crime if she "intentionally, knowingly, or recklessly . . . [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child." D.C. Code § 22-1101(b)(1). "[I]ntent to harm the child is not required[]" to prove second degree cruelty to children. *Jones v. United States*, 67 A.3d 547, 550 (D.C. 2013).

The facts supporting probable cause at the time Nagurka arrested Cruz-Roldan include:

- J.S., an infant, had suffered injuries.
- According to Dr. Jackson, these injuries were the result of pinching or compression.
- These injuries were noticed by J.S.'s parents after he returned from daycare in Cruz-Roldan's classroom.
- Prior to daycare, J.S. had been in his parents' control over the weekend and they had noticed no injuries.
- Video footage of J.S.'s classroom shows two instances of Cruz-Roldan holding/audibly patting J.S. on the day the bruises were first noticed.
- J.S. is crying during this interaction.
- The other daycare worker in the room, Lopez, said she believed Cruz-Roldan was responsible for the injuries and that she had observed Cruz-Roldan pinching and being rough with children in the past.
- During her own interview, Cruz-Roldan ultimately agreed that she may have been responsible for *some* of the marks on the child, although not intentionally.

By contrast, plaintiff points to the following facts negating probable cause:

- Dr. Jackson, who viewed a clip of the first interaction between J.S. and Cruz-Roldan, said she did not believe what was shown on video was enough to cause J.S.'s injuries.
- Lopez had denied knowing anything about J.S.'s injuries during two previous interviews.
- Lopez only changed her story once Nagurka suggested she would herself be in trouble.
- Lopez was in the United States on a "green card" (and could be subject to deportation if she were involved in trouble).
- Cruz-Roldan denied any part in J.S.'s injuries for nearly two hours until Nagurka pressured her into giving a "yes or no" answer.
- Cruz-Roldan's confession was really nothing of the sort, both because of a language barrier and because of pressure tactics used by Nagurka.

Although Cruz-Roldan has pointed to some evidence casting doubt on whether she was responsible for J.S.'s injuries, this evidence does not outweigh the mountain of objective facts supporting probable cause at the time Nagurka arrested her. Cruz-Roldan focuses most of her arguments on Lopez's interview and its allegedly coercive nature, but Nagurka likely would have had probable cause to arrest her even *without* that interview.[9] What's more, the fact that Lopez agreed to be interviewed voluntarily and was told that the door was unlocked and that she was free to leave all negate the idea that a prudent man in Nagurka's position would have believed Lopez's will was overborne by his questioning. *Cf. United States v. Baird*, 851 F.2d 376 (D.C. Cir. 1988) (concluding interrogation of suspect not custodial or coercive where suspect was told he was free to leave). Indeed, rather than switching from saying she did not see Cruz-Roldan hurting

---

[9] Cruz-Roldan points to a statement by Nagurka at his deposition that he did not have probable cause by the start of the Lopez interview, but Nagurka's subjective belief is not my focus—the objective facts are. *See Murphy*, 635 A.2d at 932 (D.C. 1993).

J.S. to saying that she did, Lopez instead ultimately admitted that she had seen Cruz-Roldan harming multiple children over the course of her employment and that she suspected the same was true of J.S.  As for Cruz-Roldan's own statements, even discounting those that are on the line or questionable, Cruz-Roldan indisputably admitted that she might, unintentionally, have been responsible for some of J.S.'s injuries. Combined, the objective, undisputed (or indisputable) evidence established probable cause for Nagurka to arrest Cruz-Roldan.  Accordingly, I grant summary judgment on Cruz-Roldan's Fourth Amendment and common law false arrest claims against Nagurka relating to this arrest.

### 2. Attempted Second Degree Cruelty to Children as to A.R.

Second, summary judgment is appropriate on both false arrest counts related to Nagurka's arrest of Cruz-Roldan for attempted cruelty to A.R.  Unlike the previous arrest, Nagurka arrested Cruz-Roldan for attempted second degree cruelty to J.S. after obtaining an arrest warrant.  An arrest pursuant to a valid warrant typically provides no basis for a false arrest claim because "the fact that a neutral magistrate has issued a warrant is the clearest indication that the [arresting] officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  As the Supreme Court has explained, "'[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because '[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.'" *Id.* at 547 (alteration in original) (quoting *United States v. Leon*, 468 U.S.

897, 921 (1984)). Nevertheless, the deference given to a warrant "gives way when the affidavit upon which the magistrate relied 'contain[ed] a deliberately or recklessly false statement,'" *Lane v. District of Columbia*, 211 F. Supp. 3d 150, 173 (D.D.C. 2016) (alteration in original) (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)), and those false statements were "material," *id.* "[A]llegedly false information in an affidavit is material only if, when it is 'set to one side, the affidavit's remaining content is insufficient to establish probable cause.'" *United States v. Ali*, 870 F. Supp. 2d 10, 27 (D.D.C. 2012) (quoting *Franks*, 438 U.S. at 156).

Here, Cruz-Roldan points to a single allegedly false statement in Nagurka's affidavit in support of the warrant for Cruz-Roldan's arrest. The affidavit stated that Nagurka reviewed video footage of April 23, 2015 and saw Cruz-Roldan "pinch" A.R.'s left cheek, after which A.R. began to cry. *See* July 17 Affidavit 2. Cruz-Roldan contends that the video does not necessarily show a pinch and is just as consistent with Cruz-Roldan's explanation that she was removing something from A.R.'s face. *See* Pl.'s Opp'n 33. She also points to testimony from an expert she has retained that it was impossible to review the video and state with any degree of certainty that what happened was a pinch. *See id.*; *see also* Dep. of Dr. Michael D. Lyman ("Lyman Dep."), Pl.'s Opp'n Ex. 23 [Dkt. #35-23] at 76:3–77:1. Having reviewed the video myself, Cruz-Roldan certainly touched A.R.'s cheek, but it is not clear whether that touch was a pinch or a lighter touch. *See* Video of April 23, 2015, Pl.'s Opp'n Ex. 25 [Dkt. #35-25] 01:09:09.

Even if I were to assume that Nagurka's statement was deliberately or recklessly false, I would have to assess whether the alleged falsehood was immaterial because the remainder of the affidavit established probable cause for the Superior Court judge to order Cruz-Roldan arrested for attempted second degree cruelty to children. Once again, an individual is guilty of second degree cruelty to children if she "intentionally, knowingly, or recklessly . . . [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child." D.C. Code § 22-1101(b)(1). D.C. Code § 22-1803 criminalizes attempting to commit a crime. The elements of attempted second degree cruelty to children are an intent "to commit *the acts* which resulted in [an] injury (or the grave risk of injury) to [a] child," *Smith v. United States*, 813 A.2d 216, 219 (D.C. 2002) (emphasis added), and "some act towards [the crime's] commission," *id.* (quoting *Blackledge v. United States*, 447 A.2d 46, 49 (D.C. 1982) (internal quotation marks omitted)). Thus, if Nagurka's affidavit established probable cause to believe that Cruz intentionally touched A.R. with sufficient force to leave a bruise, then it established probable cause to arrest her for attempted second degree cruelty to children.

I conclude that even without the alleged falsehood about what Nagurka observed on the video, the affidavit established sufficient probable cause for the judge to issue the arrest warrant. The remainder of the affidavit states:

- A.R.'s parents reported that A.R. started at Kiddie Academy on March 18, 2015. Thereafter, they noticed a bruise on A.R.'s leg around April 1, 2015. They noticed another bruise on A.R.'s right cheek that was visible after daycare on April 24, 2015. They noticed another bruise on A.R.'s right cheek around May 14, 2015. This last bruise was confirmed by a doctor.

- A.R.'s daily health checklist from Kiddie Academy stated that on April 6–8, 2015, A.R. had a bruise on both cheeks. On April 27–29, 2015, A.R. also had a bruise on her cheek.
- A witness stated that A.R. was in Cruz-Roldan's care during the months of April and May 2015. The witness stated that she saw Cruz-Roldan "pinch" A.R.'s leg when placing A.R. in a carriage, probably sometime in April 2015. The witness stated that A.R. had been complaining a lot that morning.
- The same witness stated that she observed Cruz-Roldan pinch A.R.'s cheek and that later that day a bruise developed on A.R.'s cheek where Cruz-Roldan had pinched her. This probably occurred sometime towards the end of April 2015.

July 17 Affidavit at 1–2. This affidavit cites evidence from three sources (A.R.'s parents, Kiddie Academy health checkups, and an eyewitness) that A.R. had a bruise on her cheek in late-April 2015. The eyewitness identifies Cruz-Roldan as the source of the bruise. And the eyewitness earlier observed Cruz-Roldan pinch A.R.'s leg, leaving a bruise, on a day A.R. was complaining a lot, suggesting a possible motive for the pinching. Taken together, these statements provided probable cause even absent the allegedly false testimony about the video.

In addition to Nagruka's alleged falsehood with respect to the video, Cruz-Roldan also contends that Nagurka omitted crucial information about Lopez that would have undermined Lopez's statements and thereby negated probable cause. *See* Pl.'s Opp'n at 32–34. In contrast to the allegedly false information I excised above, I must now include allegedly omitted information and determine whether the affidavit still establishes probable cause. *See Lane v. District of Columbia*, 211 F. Supp. 3d 150, 173 (D.D.C. 2016) (citing *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008)). I conclude that it does.

The information about Lopez that Nagurka allegedly omitted in his affidavit was:

- Lopez's statements prior to the June 3, 2015 interview that she had not witnessed Cruz-Roldan abusing J.S.
- Lopez's failure to mention that she had seen Cruz-Roldan abusing A.R. during the June 3 interview at which she first stated that Cruz-Roldan was harming children.
- Nagurka's inability to confirm—through the video evidence he reviewed—Lopez's allegations that Cruz-Roldan would pinch N. "all the time" and that Cruz-Roldan injured C.'s wrist.

*See* Pl.'s Opp'n 32–34.[10]

Even if Nagurka had included this information in his affidavit, it would not have negated probable cause. First, it is true that Lopez made prior statements that she did not see Cruz-Roldan harming J.S. But Nagurka's July 17 affidavit makes no reference to J.S.'s case or Lopez's statements about it at all. So the addition of information that Lopez had previously denied seeing Cruz-Roldan harm a different child before ultimately stating that she believed Cruz-Roldan was responsible for harming that different child would have no effect on the probable cause to believe that Cruz-Roldan harmed A.R. Second, Lopez's failure to mention A.R. during the June 3 interview when listing children she saw Cruz-Roldan harming is somewhat more relevant. But Lopez stated during this interview that she could not remember the names of all the children she had seen Cruz-Roldan harming. Had Nagurka included the full story about this interview—that Lopez reported Cruz Roldan "does it to everybody," including J.S., N., C., G., and

---

[10] Additionally, Cruz-Roldan contends that Nagurka omitted from his affidavit the fact that he coerced Lopez into making her statements about Cruz-Roldan. *See* Pl.'s Opp'n 34. As I explained above, the objective, undisputed (or indisputable) video evidence does not support this allegation. But even if it did, Nagurka's duty was to submit an affidavit that he *believed* to be truthful, and there is no evidence that Nagurka believed Lopez's statement was coerced. *See Franks*, 438 U.S. at 165 (requiring information in affidavit to be "'truthful' in the sense that he information put forth is believed or appropriately accepted by the affiant as true").

other babies whose names she could not remember, *see* discussion *supra* n.8—that would not have overcome probable cause to believe Cruz-Roldan harmed A.R. Third, it is likewise true that Nagurka was unable to confirm the injuries Lopez reported witnessing to N. and C. through video evidence. But he testified at his deposition that he merely kept an eye out for injuries to N. and C. when reviewing video footage he pulled and reviewed it focusing specifically on A.R. Inclusion in the affidavit of the fact that Nagurka did not witness Cruz-Roldan harming N. and C. while he was reviewing footage of the two days on which he suspected A.R. had been injured would not have negated probable cause as to A.R.

In sum, based on Nagurka's July 17, 2015 affidavit, a neutral magistrate determined that probable cause existed to arrest Cruz-Roldan for attempted second degree cruelty to children as to A.R. Neither the single alleged false statement in nor the several alleged omissions from Nagurka's affidavit would have altered that probable cause finding. Accordingly, I grant summary judgment on Cruz-Roldan's Fourth Amendment and common law false arrest claims against Nagurka relating to this arrest.

## B. Battery

Cruz-Roldan also alleges that Nagurka committed battery when he arrested her at the conclusion of her June 3, 2015 interview. *See* Pl.'s Opp'n 49–50. As I explained above, Nagurka had probable cause to make this arrest, so he was entitled to use reasonable force to effectuate it. *See Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) ("A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the

actor reasonably believes to be necessary.'" (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C. 1979))). Still, "a claim for . . . battery may be established if excessive force was used to maintain the arrest." *Jackson*, 412 A.2d at 955. Here, Cruz-Roldan does not even allege that Nagurka used excessive force in arresting her. And having reviewed video of the arrest, there is no evidence of excessive force. Cruz-Roldan Interview 02:05:00–12:12. Therefore, I will grant summary judgment to Nagurka on Cruz-Roldan's claim for battery.

## C. Intentional Infliction of Emotional Distress

Cruz-Roldan's next allegation is that Nagurka intentionally inflicted emotional distress on her by the way he investigated the case against her. "To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013) (internal quotation marks omitted). To satisfy the first requirement, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal quotation marks omitted).

Cruz-Roldan does not argue that the fact of an arrest itself was "extreme and outrageous," and she could not succeed on such an argument because "probable cause for arrest [would] defeat[] . . . [that] claim[]." *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 916–17 (D.C. Cir. 2015). Instead, she focuses on Nagurka's conduct with respect to Lopez and his alleged concealment of exculpatory information from judges and

prosecutors reviewing the case. Specifically, Cruz-Roldan argues that the following facts

could be found by a reasonable juror and could lead that juror to find Nagurka's conduct

extreme and outrageous:

- With regard to the investigation and charges involving J.S.:
    - Nagurka pressured Lopez during the June 3, 2015 interview. As a result of that pressure, Lopez falsely implicated Cruz-Roldan.[11]
    - In the affidavit Nagurka submitted to the court in support of charging Cruz-Roldan with second degree cruelty, he intentionally overstated the extent of her "confession" by claiming that she had confessed to causing the injuries to J.S.'s lower body, when in fact she stated that she might, unintentionally, have been responsible for some of J.S.'s injuries.[12]
    - In the same affidavit, Nagurka stated that a witness (i.e., Lopez) had heard Cruz-Roldan hitting J.S. but intentionally omitted that the same witness later contradicted herself on this point. *See* discussion *supra* 12 n.7.[13]
    - In the same affidavit, Nagurka deliberately omitted Dr. Jackson's opinion that the clip Nagurka sent to her of Cruz-Roldan making contact with J.S.'s back was not enough to explain J.S.'s injuries, which was exculpatory information.
    - In the same affidavit, Nagurka deliberately omitted exculpatory information regarding Lopez, namely that he pressured her into implicating Cruz-Roldan and that Lopez made prior statements that she had not seen Cruz-Roldan harming J.S.

- With regard to the investigation and charges involving A.R.:
    - Nagurka deliberately omitted exculpatory information from his affidavit in support of Cruz-Roldan's arrest, namely that Nagurka was unable to corroborate allegations Lopez ultimately made identifying other children Cruz-Roldan had harmed.

---

[11] Cruz-Roldan frames this possible jury finding as "[Nagurka] coerced Marya Lopez into making false claims against Ms. Cruz-Roldan." Pl.'s Opp'n 46. Even drawing all inferences and resolving all disputes in Cruz-Roldan's favor, this overstates (by oversimplifying) what a reasonable juror could find. Given my review of the video of the interview, the most a reasonable juror could find is that Nagurka applied some pressure (typical of a police interview) to Lopez and that as a result of this pressure she stated for the first time that she had seen Cruz-Roldan harming other children.
[12] Cruz-Roldan frames this possible jury finding as "[Nagurka] falsely claimed [Cruz-Roldan] had confessed." Pl.'s Opp'n 46.
[13] Cruz-Roldan frames this possible jury finding as "[Nagurka] made a false statement concerning a witness that she had heard plaintiff hitting JS." Pl.'s Opp'n 46.

- o Nagurka falsely claimed to see Cruz-Roldan pinch A.R. on video when the video only showed her touching A.R.'s cheek.

- After these charges were filed:
  - o When asked by prosecutors if there was any exculpatory material in the case, Nagurka deliberately failed to bring to their attention Dr. Jackson's opinion or the fact that Lopez had implicated Cruz-Roldan only after being pressured by him.[14]

These allegations, if found by the jury to be true, would paint a troubling picture of a police officer so bent on securing a conviction against Cruz-Roldan that he overstated the evidence against her and disregarded, downplayed, and even concealed evidence tending to exculpate her. But as troubling as such findings would be, they would still not meet the high bar of "extreme and outrageous" conduct under D.C. law. A review of cases applying this standard to the actions of police officers under D.C. law reveals several with comparable or more troubling fact patterns that the court concluded were not sufficiently "extreme and outrageous" to go to a jury. *See, e.g., Minch v. District of Columbia*, 952 A.2d 929, 932, 940–41 (D.C. 2008) (affirming grant of summary judgment on IIED claim because police officer's threat that innocent murder suspect would be put in jail for life if he did not confess was not extreme and outrageous); *Smith v. District of Columbia*, 882 A.2d 778, 781–86, 793–94 (D.C. 2005) (affirming directed verdict on IIED claim because police officer's use of an illegal chokehold that broke plaintiff's jaw, followed by police officer rubbing plaintiff's jaw,

---

[14] Cruz-Roldan also proposes that a jury could find that "Nagurka continued to threaten Lopez with incarceration during the pendency of the prosecutions in order to ensure her continued cooperation." Pl.'s Opp'n 47. She cites no evidence supporting this assertion, and I have seen none.

were not extreme and outrageous); *Smith v. United States*, 121 F. Supp. 3d 112, 124–26 (D.D.C. 2015) (dismissing IIED claim based on allegations that police officers exaggerated and embellished plaintiff's unlawful conduct).

The case closest on point that did proceed to a jury, *District of Columbia v. Tulin*, 994 A.2d 788 (D.C. 2010), is readily distinguishable. There, the D.C. Court of Appeals accepted a jury verdict in the plaintiff's favor on an IIED claim brought against a police officer who, according to the plaintiff, had falsely and maliciously reported that the plaintiff had been driving recklessly and had effectively ordered a subordinate to arrest the plaintiff, in order to camouflage the officer's own responsibility for the car accident that had resulted from the plaintiff's purported crime. *Id.* at 800–03; *see also Smith*, 121 F. Supp. 3d at 125 (distinguishing *Tulin*). Here, by contrast, even if a jury found that Nagurka exaggerated aspects of Cruz-Roldan's statement and what he could glean from the video, he certainly did not fabricate the fact that multiple children had suffered harm. Accordingly, Nagurka's conduct, even if as bad as a reasonable jury could find it to be, would not be "extreme and outrageous" enough to support an IIED claim.[15] Therefore, I will grant summary judgment to Nagurka on Cruz-Roldan's claim for intentional infliction of emotional distress.

---

[15] Moreover, it is unclear how Cruz-Roldan could prove the third requirement of an IIED claim, that she suffered severe emotional distress. Here, there does not appear to be evidence sufficient to support such a finding. *See Kotsch v. District of Columbia*, 924 A.2d 1040, 1045–46 (D.C. 2007) ("[A]ppellant did not seek medical assistance for physical or psychological injury. Therefore . . . without an expert, the record does not provide evidence from which a reasonable jury could find that [the officers'] conduct was so 'extreme and outrageous' that it caused severe emotional distress to appellant.").

## D. Negligence

Finally, Cruz-Roldan claims that Nagurka acted negligently in investigating the case against her. Specifically, in her complaint, she alleges that Nagurka acted negligently in the way he "interview[ed] witnesses and convey[ed] exculpatory evidence to prosecutors." Compl. ¶ 7. The plaintiff in a negligence action bears the burden of proof on three issues: (1) the applicable standard of care, (2) a deviation from that standard by the defendant, and (3) a causal relationship between that deviation and the plaintiff's injury. *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988).

Nagurka makes two arguments in favor of summary judgment on the negligence counts. First, he claims that the "public duty" doctrine bars recovery. But even a cursory review of this doctrine, under which the District and its agents generally "owe no duty to provide public services to particular citizens as individuals," demonstrates that it does not apply here. *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990). The public duty doctrine is about nonfeasance, not the misfeasance alleged by Cruz-Roldan. "The public duty doctrine 'deals with the question whether public officials have a duty to protect individual members of the general public against harm from third parties or other independent sources,'" and "[a]s such, it is wholly inapposite in a case such as this, where the alleged harm was brought about directly by the officer[] [him]sel[f], and where there is no allegation of a failure to protect." *Liser v. Smith*, 254 F. Supp. 2d 89, 102 (D.D.C. 2003) (quoting *District of Columbia v. Evans*, 644 A.2d 1008, 1017 n.8 (D.C. 1994)).

Second, Nagurka insists that Cruz-Roldan has failed to establish a national standard of care. The applicable standard of care in this sort of case, which involves the

exercise of professional judgment, is a national one that must be established by expert testimony. *See Etheredge v. District of Columbia*, 635 A.2d 908, 917 (D.C. 1993); *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997). The expert must identify a "concrete standard upon which a finding of negligence could be based." *District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C. 1990). The expert must clearly articulate what the standard is and how it was violated by defendants, which is to be done by comparing "specific standards with specific facts or conduct." *Id.*; *see also District of Columbia v. Moreno*, 647 A.2d 396, 400–01 (D.C. 1994) (rejecting expert testimony that "briefly referred to standards without eliciting what the standards are or what they require"). If the expert fails to do so, summary judgment is appropriate. *See Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997) (granting directed verdict where expert failed to articulate national standard of care against which to compare defendants' acts).

Here, Cruz-Roldan's proposed expert is Dr. Michael D. Lyman ("Lyman"). *See* Expert Report of Michael D. Lyman ("Lyman Report"), Pl.'s Opp'n Ex. 22 [Dkt. #35-22]. Lyman is a former criminal investigator and police instructor who is currently a professor at the Columbia College Department of Criminal Justice and Human Services and who has authored seven books dealing with various areas of policing. *See* Lyman Report 2–3. According to his C.V., Lyman has provided expert testimony about police practices over 200 times, including at trial in numerous federal civil cases. *See* Lyman C.V., Pl.'s Opp'n Ex. 21 [Dkt. #35-21] 4, 6–30. In his expert report, Lyman refers to national standards articulated by the International Association of Chiefs of Police

("IACP") as to proper procedures for police interrogations and the handling of exculpatory material. *See* Lyman Report 11–13, 15–17. Nagurka does not, as a general matter, contest Lyman's use of IACP guidelines to establish national standards of care, and these guidelines have been used before to articulate national standards of police conduct in the District. *See Sherrod v. McHugh*, 334 F. Supp. 3d 219, 259–60 (D.D.C. 2018) (approving standard of care established by relying on IACP standards); *Hetzel v. United States*, No. 91-cv-2986, 1993 WL 294794, at *3–4 (D.D.C. June 1, 1993) (citing IACP standards as establishing standard of care); *see also District of Columbia v. Chambers*, 965 A.2d 5, 8–9 (D.C. 2009) (granting a directed verdict on police negligence claim but noting without comment use of IACP standards).

Nagurka does contend, however, that the IACP guidelines relating to interrogations are inapposite here because they refer to custodial interrogations of suspects rather than third-party witnesses. Def.'s Mot. 32. Plaintiff responds by citing to Lyman's deposition, where he stated that there is a "kind of gray area from when a witness or even a victim . . . implicate[s] themselves at least in the eyes of the detective and they become a suspect" and that as a result the same standards applied both to suspects being interrogated and to interviewees. Pl.'s Opp'n 45–46 (quoting Lyman Dep. 54:1–5). Even if that is the case, however, I conclude that this "gray area," and the general language Lyman cites in this particular IACP policy were not specific enough to articulate a national standard of care against which Nagurka's conduct can be measured. Therefore, I GRANT summary judgment for the defendant as to Cruz-Roldan's negligence claim based on Lopez's interview.

The remaining negligence claim, based on Nagurka's alleged failure to turn over exculpatory evidence to prosecutors, is another matter. Here, Lyman articulates a simple and easily-followed standard based on IACP guidelines that police have a duty to notify prosecutors of exculpatory evidence, which IACP guidelines define as "evidence that is favorable to the accused" and that "is material to the guilt, innocence, or punishment of the accused." Lyman Report 16. Nagurka does not challenge this standard. Rather, he argues that there is no evidence to support it, as the only evidence in the record is Nagurka's statement that he turned exculpatory evidence over to prosecutors. *See* Def.'s Mot. 21. Not so. As Cruz-Roldan outlines in her opposition, there is evidence from which a reasonable juror could disbelieve Nagurka. *See* Pl.'s Opp'n 43–45. Indeed, the timing of the ultimate disclosure of Dr. Jackson's email followed by the Government's choice to dismiss the case is especially suspect. As such, I DENY summary judgment on Cruz-Roldan's negligence claim based on Nagurka's alleged failure to inform prosecutors of exculpatory evidence in the case.

## CONCLUSION

For the foregoing reasons, Nagurka's [Dkt. #34] Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. As this ruling disposes of all the federal questions in this case, the Clerk of Court is hereby ORDERED to REMAND this case

back to the Superior Court of the District of Columbia.[16]  A separate Order consistent

with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[16] A district court may choose to retain jurisdiction over, or dismiss, pendent state law
claims after federal claims are dismissed.  *See Edmondson & Gallagher v. Alban Towers
Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995).